FILED

AUG 18 2021

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **4:21CR458 SEP/SRW** |
| | ) |
| | ) |
| DEANDRE D. HORNE, | ) |
| | ) |
| Defendant. | ) |

## **INDICTMENT**

The Grand Jury charges that:

### **Introduction**

1.      From in or about September of 2016 to present, Defendant **Deandre D. Horne** obtained and attempted to obtain money and property by means of materially false and fraudulent representations.  Defendant Horne created multiple corporate entities and used those entities to fraudulently obtain Government program and financial institution funds.

### **Defendant Horne's Businesses**

2.      At all times relevant to this Indictment, Defendant Horne has been the owner of Serenity Home Health Care CDS ("Serenity") a business that provides personal care services, including consumer directed services ("CDS"), that are funded by the Missouri Medicaid program. Serenity is located in St. Louis, Missouri, within the Eastern Division of the Eastern District of Missouri.

3.      At all times relevant to this Indictment, Defendant Horne as an individual, or through Serenity, submitted and caused to be submitted reimbursement claims to the Missouri Medicaid program.

4.     At all times relevant to this Indictment, Defendant Horne also was an owner of Budget Trucking, LLC ("Budget Trucking") and Budget Towing & Recovery, LLC ("Budget Towing"). Budget Trucking and Budget Towing & Recovery are businesses located in St. Louis, Missouri, within the Eastern Division of the Eastern District of Missouri.

### Background

### The Missouri Medicaid Program

5.     The Missouri Medicaid Program is a health care benefit program within the meaning of 18 U.S.C. § 24(b) that affects interstate commerce and provides low-income citizens of Missouri with medical benefits, items, and services. Funded by federal and state tax revenue, the Missouri Department of Social Services administers the Missouri Medicaid Program under federal law, with guidance from the United States Department of Health and Human Services.

6.     Under certain circumstances, the Missouri Medicaid program provides reimbursement for personal care services delivered to beneficiaries in the home setting. Personal care services include meals, the cleaning and grooming of the beneficiary, medication management, and other services. The goal of personal care services is to enable the beneficiary to remain in the home setting with just outpatient treatment instead of long-term inpatient stays in hospitals and nursing homes.

7.     Personal care services reimbursed by the Missouri Medicaid program include consumer directed services ("CDS"). As with all personal care services, the purpose of the CDS program is to allow physically disabled Medicaid recipients, or "consumers," to receive services that enable them to live independently. These consumers must not have a legal limitation of their ability to make decisions, and must be able to hire, train, supervise, and direct their personal care attendants.

2

8.     CDS services are provided by personal care attendants ("PCAs"), who are selected by the consumer.  The services must be provided through eligible vendors, of which Serenity is an example.  Although the consumers are officially the "employers" of PCAs, the vendors handle all of the administrative functions, including but not limited to:

a.     Having a valid Medicaid participation agreement;

b.     Performing  (directly  or  by  contract)  payroll  and  fringe  benefit accounting functions for consumers;

c.     Collecting timesheets from PCAs and certifying their accuracy;

d.     Transmitting individual payments to PCAs on behalf of the consumer;

e.     Ensuring all payroll, employment, and other taxes are paid timely; and

f.     Filing  claims  for  Medicaid  reimbursement,  either  directly  or  by contract.

9.     Vendors also must ensure that the consumer's case file includes, among other things, a written plan of care and service authorization that document the type of service and quantity of units to be provided, as well as original time sheets that contain the PCA's name, the consumer's name, dates and times of service delivery, the types of activities performed at each visit, the PCA's signature for each visit, and the consumer's signature verifying service delivery for each visit.  Vendors also are permitted to use an electronic visit verification ("EVV") system, through which PCAs can clock-in and clock-out to record when they begin and end their shifts with particular consumers.

10.     When presenting claims to the Missouri Medicaid program, vendors submit a procedure code that describes the service they are providing.  The amount of reimbursement is tied to the code and is set to a fee schedule.  The claim also must state the dates the PCA purportedly

3

provided the service, and must state the number of "units," which break down into 15-minute intervals. The reimbursement rate increases proportionately based on the number of units. In order to determine the reimbursement by Missouri Medicaid for a given date of service, the rate is multiplied by the number of "units."

11.     All Medicaid providers, including CDS providers, must retain fiscal and medical records that fully document services billed to Medicaid for five years from the date of service, and must furnish or make the records available for inspection or audit by the Missouri Medicaid Program or its representatives upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program.

### Background on the National Unemployment Insurance Program

12.     The Social Security Act of 1935 established a national Unemployment Insurance ("UI") program. Unemployment Insurance is funded by both federal and state payroll taxes. Each state receives federal funding to administer its own unemployment insurance program. Each state also sets its own eligibility requirements and benefit amounts.

13.     In Missouri, the federal UI System is administered by the Missouri Division of Employment Security ("MODES"). The United States government funds all administrative costs, including salaries, office expenses, and computer equipment utilized by MODES. UI benefits paid to unemployed workers in the private sector are financed by taxes on employers.

14.     In response to the surge in unemployment caused by the COVID-19 pandemic, the United States Government enacted several laws which provided additional funding for unemployment benefits. The Coronavirus Aid, Relief, and Economic Security Act (the "CARES

Act") was signed into law on March 27, 2020. The $2.2 trillion package included various provisions increasing and expanding unemployment insurance benefits available to workers, including individuals who are unemployed, partially unemployed, or unable to work due to COVID-19.

15.     Under the Federal Pandemic Unemployment Compensation ("FPUC") provision of the Act, individuals who are eligible for unemployment benefits received an extra $600 weekly benefit for all weeks of unemployment between April 5, 2020 and July 31, 2020, in addition to the amount the individual otherwise would be entitled to receive under state law. The $600 supplemental benefit should be paid for any week in which an individual receives unemployment benefits under state programs. This additional benefit is taxable, as is the case with all unemployment compensation, but will be disregarded for purposes of determining income for Medicaid or Children's Health Insurance.

16.     The federal Lost Wages Assistance ("LWA") program for unemployed workers, which began during the week ending August 1, 2020, was to be paid through the week ending on September 5, 2020, for a total of six weeks. The LWA provided a $300 weekly federal supplement for eligible unemployed Missourians.

17.     The LWA was funded through a grant from FEMA's Disaster Relief Fund. Pursuant to an Executive Order dated August 8, 2020, FEMA, with guidance from the U.S. Department of Labor, was instructed to administer the LWA program.  To receive LWA benefit payments, an unemployed individual must be eligible to receive at least $100 in unemployment benefits per week, and the individual must self-certify that they are unemployed or partially unemployed as a result of the COVID-19 pandemic.

5

### Background On The PPP Program

18.     The United States Small Business Administration (hereinafter "SBA") is an executive branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in economic recovery after disasters.

19.     To aid this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

20.     The CARES Act provided emergency financial assistance to the millions of Americans suffering the economic impact caused by the COVID-19 pandemic. One source of relief provided for in the CARES Act is the authorization of forgivable loans to small businesses for job retention and certain other expenses, through the Paycheck Protection Program (hereinafter "PPP").

21.     To obtain a PPP loan, a qualifying business is required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application requires the business to acknowledge the program rules and make certain affirmative certifications in order to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) is required to certify: (a) that the small business was in operation on February 15, 2020; (b) average monthly payroll expenses; and (c) number of employees. These certifications are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for PPP loans are required to submit documentation supporting their payroll expenses.

6

22.     A PPP loan application is then processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the loan using its own monies, which are then guaranteed by the SBA.

23.     PPP loan funds are required to be used on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities for the business.  Under the applicable PPP rules and guidance, the interest and principal on the PPP loan is eligible for forgiveness if the business spent the loan proceeds on these expense items within a designated period of time and used a certain portion of the loan toward payroll expenses.

### Background on the EIDL Program

24.     In addition to PPP loans, SBA assistance under the CARES Act also includes making direct loans to applicants through the Economic Injury Disaster Loan (hereinafter "EIDL") program.

25.     Pursuant to the CARES Act, the SBA's EIDL program was expanded to provide small businesses with low-interest loans of up to $2 million prior to in or about May 2020, and up to $150,000 beginning in or about May 2020, in order to provide vital economic support to help overcome the loss of revenue small businesses are experiencing due to the COVID-19 pandemic. To qualify for an EIDL, an applicant must have suffered "substantial economic injury" from the COVID-19 pandemic, based on a company's actual economic injury as determined by the SBA. EIDLs may be used for payroll and other costs, as well as to cover increased costs due to supply chain interruption, to pay obligations that cannot be met due to revenue loss, and for other similar uses.

26.     The SBA Office of Disaster Assistance (hereinafter "ODA"), headquartered in Washington, D.C., is responsible for administering the EIDL program. The ODA has authority

7

over all loans created and disbursed under the EIDL program. EIDL principal proceeds are solely funded by the SBA and disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

27.    To qualify for an EIDL, applicants are required to submit applications to the SBA generally through the SBA's website, wherein the applicant provides information including the business's name, Employer Identification Number (hereinafter "EIN") or social security number for sole proprietorships, gross revenue and cost of goods for the prior year, address, email, date of establishment, number of employees as of January 31, 2020, and bank account information. Applicants are required to certify under penalty of perjury that the information provided in the EIDL application is true and correct.

28.    Pursuant to the provisions governing the EIDL program, loan proceeds are required to be used on certain permissible business expenses. The EIDL funds could be used by the afflicted business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid absent the impact of the COVID-19 pandemic.

29.    Applicants are not required to provide supporting documents to the SBA. The SBA relies on the truthfulness of an applicant's submission.

30.    Servers for the Central United States region of the SBA, which processes all SBA EIDL applications for the region, are located in Iowa.

### Serenity Home Health Care CDS

Enrollment and Participation in Missouri Medicaid

31.    In or about September of 2016, Defendant Horne applied to enroll Serenity in the Missouri Medicaid program as a provider of consumer directed services ("CDS") to Missouri Medicaid recipients in the St. Louis area.

8

32.     On or about April 20, 2017 and April 10, 2018, Defendant Horne attended MMAC's Annual Provider Update Meetings, during which representatives from CDS companies, such as Serenity, were trained on the rules and regulations of the program.

33.     Since January of 2017, Serenity has submitted claims for reimbursement to Missouri Medicaid for CDS services exceeding $2,400,000.   At all times relevant to this Indictment, Defendant Horne was the Chief Executive Officer of Serenity and was responsible for Serenity's billing to the Missouri Medicaid program.

34.     At all times relevant to this Indictment, Defendant Horne was a signatory to Serenity's various bank accounts, including Serenity's accounts at PNC Bank ending in 7169, Commerce Bank account ending in 2465, Regions Bank accounts ending in 1385, 0552, and 5432, U.S. Bank account ending in 8263, JP Morgan Chase Bank account ending in 6917, and Bank of America account ending in 3544.

Claim For Unemployment Insurance Benefits Due To Lack Of Work With Serenity

35.     In or about April 23, 2020, Defendant Horne applied for unemployment insurance benefits with the Missouri Department of Employment Security ("MODES"), stating that he was laid off by Serenity due to lack of work.   Between April 25, 2020 and August 8, 2020, Defendant Horne received approximately $12,280 in unemployment insurance benefits, including federal enhanced unemployment insurance benefits available due to the COVID-19 pandemic.

36.     During the time period in which Defendant Horne applied for and received unemployment insurance benefits, Defendant Horne continued to receive payments from Serenity, of which he is the owner.

9

Purchase Of Serenity Business Vehicle

37.     On or about July 3, 2020, Defendant Horne purchased a 2020 Ford Truck F-150 Series, which purportedly was a business vehicle for Serenity, for the price of $60,519.00. Defendant Horne filled out a Business Credit Application for financing of the vehicle on behalf of Serenity.

38.     Along with his application for Missouri Title and License for the vehicle, Defendant Horne submitted a fraudulent total loss letter written on forged American Family Insurance letterhead for a 2017 Porsche Cayenne Turbo AWD, which stated that the cash value of the loss of that vehicle was $59,248.82. As a result, the loss amount from the Porsche Cayenne Turbo AWD was offset against the sale price for the 2020 Ford Truck F-150 Series for purposes of calculating the sales tax on the vehicle.

**Budget Towing and Recovery, LLC and Budget Trucking, LLC**

39.     On or about October of 2018, Defendant Horne and his business partner, who has the initials J.R., formed Budget Towing and Recovery, LLC, which purported to be a towing company in the State of Missouri.

40.     On or about December 2018, Defendant Horne and J.R. formed Budget Trucking, LLC, which purported to be a trucking company in the State of Missouri.

41.     At all times relevant to this Indictment, Defendant Horne was a signatory to Budget Towing and Recovery's Simmons Bank account ending 8858 and Budget Trucking's Simmons Bank account ending 5158.

42.     On or about July 15, 2020, Defendant Horne submitted a PPP loan application to FundBox, which is based in Plano, Texas, on behalf of Budget Towing and Recovery along with supporting documentation, including but not limited to documentation of Budget Towing's

10

payroll. This application resulted in the issuance of PPP Loan Number 5129228110 to Budget Towing and Recovery in the amount of $135,707.95

43.     On or about June 30, 2020, Defendant Horne submitted an EIDL loan application to the SBA, which was routed through SBA's servers in Iowa, on behalf of Budget Towing and Recovery. This resulted in the issuance of EIDL Number 4582218100 to Budget Towing and Recovery in the amount of approximately $120,000.

44.     On or about May 11, 2020, Defendant Horne submitted a PPP loan application to BlueVine, a financial technology company based in California, on behalf of Budget Trucking along with supporting documentation, including but not limited to documentation of Budget Trucking's payroll. Defendant Horne signed the application with the name of Jimmie Robertson. This application resulted in the issuance of PPP Loan Number 5013787410 to Budget Trucking in the amount of $40,632.00.

### Count 1
### Health Care Fraud Scheme
### 18 U.S.C. §§ 1347 and 2

45.     Paragraphs 1 through 11 and 31 through 38 are incorporated by reference as if fully set out herein.

46.     Beginning in or about 2017 until present, Defendant Horne willfully executed and attempted to execute a scheme and artifice to defraud a health care benefit program, in connection with delivery of or payment for health care benefits, items, or services as described below.

Enrollment in Missouri Medicaid

47.     At all times relevant to this Indictment, Defendant Horne was the owner and Chief Executive Officer of Serenity.

11

48.     On or about September 27, 2016, Defendant Horne applied to enroll Serenity in the Missouri Medicaid program.

49.     Defendant Horne submitted with the enrollment application a business plan for Serenity, which stated that "DeAndre Horne will handle the Administration aspect of the agency & Mr. Horne will manage the financial aspect of the agency."

50.     On or about January 20, 2017, Defendant Horne also filled out a MO Healthnet Provider Enrollment Application on behalf of Serenity, in which he falsely checked "no" in response to the question: "Has the applying provider, any managing employee, or any person having an ownership or control interest; ever been convicted of a crime, excluding minor traffic citations?"

51.     After Serenity was approved to enroll in the Missouri Medicaid program, Defendant Horne signed a participation agreement on behalf of Serenity dated January 20, 2017, in which he certified: "I am responsible for all services provided and all billing done under my provider number regardless to whom the reimbursement is paid.  It is my legal responsibility to ensure that the proper billing code is used and indicate the length of time I actually spend providing a service regardless to whom the reimbursement is paid."

52.     By signing the participation agreement, Defendant Horne also acknowledged: "All providers are required to maintain fiscal and medical records to fully disclose services rendered to Title XIX Medicaid recipients.  These records shall be retained for five (5) years and shall be made available on request by an authorized representative of the Department of Social Services or the U.S. Department of Health and Human Services."

53.     On or about January 27, 2017, Defendant Horne signed a training outline on behalf of Serenity entitled "Making CDS Work!"  The training covered issues such as "identifying

issues…considered fraud of the program," and requirements for CDS providers to maintain time sheets documenting "Attendant's name, Consumer's name, Dates & Times of services delivery, Activities performed at visit, Attendant's signature each visit, [and] Consumer signature verifying service for each visit."

54.     On or about January 27, 2017, Defendant Horne also submitted to Missouri Medicaid a signed policy and procedure on behalf of Serenity related to misappropriation of participants' property or falsification of service delivery documents.   The policy stated that "SERENITY HOME HEALTH CARE CDS, LLC is committed to preventing and eliminating any forms of fraud and abuse."   The policy also stated that Serenity would verify "all attendants working for the consumers are trained properly on how to prepare their bi-weekly timesheets, making sure they are signed by both the consumer and the attendant."   Finally, the policy stated that Serenity

> also understands that any person who with the intent to defraud or deceive, makes, causes to be made, or assists in the preparation of any false statement, misrepresentation, or omission of material fact in any claim or application for any claim, regardless of the amount knowing the same to be false, is subject to civil or criminal sanctions, or both, under all applicable state and federal statutes.

Billing For Services Without Supporting Documentation

55.     Between January 2017 and into 2018, Serenity billed Missouri Medicaid for personal care services while having no system in place to handle its payroll.   During this time, Defendant Horne withdrew large amounts of the Missouri Medicaid payments deposited into Serenity's PNC bank account ending in 7169 in cash.

56.     On or about January 26, 2017, Defendant Horne entered into a contract on behalf of Serenity with an electronic visit verification ("EVV") company, CareTime, which is a service Missouri Medicaid allows vendors to use to track PCAs' time providing personal care services to

various consumers. PCAs are supposed to clock-in and clock-out of the EVV system when they begin and end their shifts with particular consumers.

57.     It was part of the scheme that neither Defendant Horne nor any other Serenity employee ever logged into Serenity's CareTime account to clock-in and clock-out, which would have documented that care was provided by Serenity PCAs.

58.     It was further part of the scheme that Defendant Horne, on behalf of Serenity, provided EVV records to the Government that did not originate from Serenity's CareTime system, thus falsely documenting more than $1.1 million of care that Serenity billed to Missouri Medicaid.

59.     It was further part of the scheme that Serenity also purportedly maintained time sheets to document care provided to Missouri Medicaid beneficiaries, which were required to contain the PCA's name, the consumer's name, dates and times of service delivery, the types of activities performed at each visit, the PCA's signature for each visit, and the consumer's signature verifying service delivery for each visit.

60.     It was further part of the scheme that Defendant Horne provided to the Government timesheets that lacked these items, including but not limited to the PCA's or consumer's signature.

61.     It was further part of the scheme that in many cases, Serenity billed for PCA services for which it did not have any valid EVV or timesheet documentation.

Billing For Services Not Provided By Defendant Horne

62.     Defendant Horne purportedly was the PCA for various Missouri Medicaid beneficiaries, including but not limited to beneficiaries with the initials J.P., J.B., and D.D.

63.     It was part of the scheme that on several occasions, Defendant Horne, through Serenity, billed Missouri Medicaid for care purportedly provided by Defendant Horne for which there was no valid record reflecting that Defendant Horne had provided the care.

14

64.     It was further part of the scheme that on several occasions, Serenity submitted claims for care purportedly provided by Defendant Horne to various beneficiaries in their homes in the Eastern District of Missouri, when in fact Defendant Horne was traveling elsewhere in the United States or in foreign countries.   Serenity received at least $3,900.00 for such claims. Examples of Defendant Horne, through Serenity, billing for services not provided are described in the following paragraphs.

65.     On or about November 17, 2017, Serenity received $215.19 in reimbursement from Missouri Medicaid for approximately 14 hours of personal care services that Defendant Horne purportedly provided to a beneficiary with the initials J.P.  During the week in which Defendant Horne claimed to be providing these personal care services in the Eastern District of Missouri, Defendant Horne was in Tel Aviv, Israel, Paris, France, and Atlanta, Georgia.

66.     On or about September 8, 2017, Serenity received $303.42 in reimbursement from Missouri Medicaid for approximately 20 hours of personal care services that Defendant Horne purportedly provided to a beneficiary with the initials D.D.  During the week in which Defendant Horne claimed to be providing these personal care services in the Eastern District of Missouri, Defendant Horne was in Paris, France.

67.     On or about March 23, 2018, Serenity received $294.53 in reimbursement from Missouri Medicaid for personal care services that Defendant Horne purportedly provided to J.P. During the week in which Defendant Horne claimed to be providing these personal care services in the Eastern District of Missouri, Defendant Horne was in Mississippi.

68.     On or about November 22, 2019, Serenity received $319.20 in reimbursement from Missouri Medicaid for approximately 20 hours personal care services that Defendant Horne purportedly provided to a beneficiary with the initials J.B.  During the week in which Defendant

Horne claimed to be providing these personal care services in the Eastern District of Missouri, Defendant Horne was in Los Angeles, California and Miami, Florida.

69.     It was further part of the scheme that Defendant Horne, through Serenity, received reimbursement for providing an average of approximately 74 hours of weekly personal care services to Missouri Medicaid beneficiaries in the Eastern District of Missouri between January and December of 2020.  Defendant Horne traveled extensively during that time period, and at times was residing in the State of Georgia.

Use Of Criminal Proceeds

70.     As a result of the submission of claims for services that were not provided and/or for which there was no supporting documentation, Missouri Medicaid paid at least $1.1 million to Serenity to which it was not entitled.  Defendant Horne received a portion of the funds to which he was not entitled into his personal bank accounts in the form of payroll from Serenity for PCA services he did not provide, transfers from Serenity accounts to Horne's personal accounts, and Defendant Horne's cash withdrawals from Serenity business accounts.

Execution of the Fraud Scheme

71.     On or about the dates listed below, in the Eastern District of Missouri, the defendant,

**DEANDRE D. HORNE,**

knowingly and willfully executed and attempted to execute, the above-described scheme or artifice to defraud the listed health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendant submitted, and caused to be submitted through his company Serenity false reimbursement claims to Missouri Medicaid for personal care services that he knew had not been performed:

16

| Recipient Initials | PCA | Dates of Service | Amount Paid | Paid Date |
|---|---|---|---|---|
| J.P. | Defendant Horne | 11/9/2017-11/13/2017 | $215.19 | 11/17/2017 |
| D.D. | Defendant Horne | 8/27/2017-8/29/2017 | $303.42 | 9/8/2017 |
| J.P. | Defendant Horne | 3/14/2018-3/21/2018 | $294.53 | 3/23/2018 |
| J.B. | Defendant Horne | 11/15/2019-11/19/2019 | $319.20 | 11/22/2019 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## Count 2
## Theft of Government Money
## 18 U.S.C. § 641

72. Paragraphs 1 through 17 and 35 through 36 are incorporated by reference as if fully set out herein.

73. Beginning in or around April 23, 2020 and continuing without interruption until in or around August 10, 2020 in the city of St. Louis, Missouri, within the Eastern Division of the Eastern District of Missouri, and elsewhere:

### DEANDRE D. HORNE,

the defendant herein, did knowingly embezzle, steal, and purloin money of the Department of Labor, a department or agency of the United States, namely, unemployment insurance benefits to which he knew he was not entitled, having a value of approximately $12,280.

All in violation of Title 18, United States Code, Sections 641 and 2.

## Counts 3 through 5
## Wire Fraud
## 18 U.S.C. § 1343

74.     Paragraphs 1 through 4, 18 through 30, and 39 through 44 are incorporated by reference as if fully set forth herein.

75.     From on or about May 11, 2020 to on or about July 15, 2020, in St. Louis, in the Eastern District of Missouri, the defendant,

### DEANDRE D. HORNE,

devised and intended to devise a scheme and artifice to obtain money by means of false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

Budget Towing and Recovery PPP Loan

76.     It was a part of the scheme that on or about July 15, 2020, Defendant Horne submitted a PPP loan application to FundBox on behalf of his business Budget Towing and Recovery, LLC in the amount of $135,707.95.

77.     It was further part of the scheme that Defendant Horne altered the articles of organization submitted with the application to remove the name of Budget Towing and Recovery's other owner, J.R., from the document.

78.     It was further part of the scheme that Defendant Horne falsely and fraudulently represented on the PPP loan application for Budget Towing and Recovery that the company had ten employees, when in truth and fact, the company had no employees aside from Defendant Horne and J.R.

79.     It was further part of the scheme that Defendant Horne falsely represented on the PPP loan application for Budget Towing and Recovery that the average monthly payroll was $40,000, when in truth and fact, the company had no payroll expenses.

80.     It was further part of the scheme that Defendant Horne certified on the application that "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

81.     It was further part of the scheme that on or about July 24, 2020, which was shortly after the PPP Loan proceeds were transferred to Budget Towing and Recovery's Simmons Bank account ending 8858, Defendant Horne withdrew $12,500 in cash from the account and had a cashier's check in the amount of $30,000 prepared for F&R Services, LLC, which was another company associated with Defendant Horne.

82.     It was further part of the scheme that but for Defendant Horne's misrepresentations on the PPP loan application and supplemental documentation, FundBox would not have approved PPP Loan Number 5129228110 to Budget Towing and Recovery in the amount of $135,707.95.

Budget Towing and Recovery EIDL Loan

83.     It was a part of the scheme that on or about June 30, 2020, Defendant Horne submitted an EIDL loan application to the SBA on behalf of his business Budget Towing and Recovery, LLC.

84.     It was further part of the scheme that Defendant Horne falsely and fraudulently represented on the EIDL loan application for Budget Towing and Recovery that the company had ten employees, when in truth and fact, the company had no employees aside from Defendant Horne and J.R.

85.     It was further part of the scheme that Defendant Horne falsely represented on the EIDL loan application for Budget Towing and Recovery that the gross revenues for the 12 months prior to the disaster were $260,000, when the gross revenues in truth and fact were significantly less than that.

86.     It was further part of the scheme that but for Defendant Horne's misrepresentations on the EIDL loan application, the SBA would not have approved EIDL Loan Number 4582218100 to Budget Towing and Recovery in the amount of approximately $120,000.

Budget Trucking PPP Loan

87.     It was a part of the scheme that on or about May 11, 2020, Defendant Horne submitted a PPP loan application to BlueVine on behalf of his business Budget Trucking, LLC in the amount of $40,632.

88.     It was further part of the scheme that Defendant Horne falsely listed the applicant as Jimmie Robertson and the contact phone number as Defendant Horne's phone number.

89.     It was further part of the scheme that Defendant Horne falsely represented on the PPP loan application for Budget Trucking that the average monthly payroll was $16,253, when in truth and fact, the company had no payroll expenses.

90.     It was further part of the scheme that Defendant Horne submitted with the application fraudulent Schedule C tax documents that never were filed with the IRS.

91.     It was further part of the scheme that Defendant Horne certified on the application that "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

92.     It was further part of the scheme that in or about May 13, 2020, which was shortly after the PPP loan proceeds were transferred to the Simmons Bank account ending 5158, Defendant Horne made 41 payments to his American Express card in excess of $100,000. Purchases on that card consisted of personal expenditures, including but not limited to purchases from luxury retailer Louis Vuitton.

93.     It was further part of the scheme that but for Defendant Horne's misrepresentations on the PPP loan application and supplemental documentation, BlueVine would not have issued PPP Loan Number 5013787410 to Defendant Horne in the amount of $40,632.

94.     On or about the date set forth below, in the Eastern District of Missouri, the defendant,

**DEANDRE D. HORNE,**

having devised and intended to devise a scheme to obtain money by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count.

21

| COUNT | DATE | WIRE TRANSACTION | AMOUNT |
|---|---|---|---|
| 3 | July 24, 2020 | Loan transmitted from FundBox to Budget Towing and Recovery Simmons Bank account ending in 8858 | $135,707.95 |
| 4 | June 30, 2020 | SBA Loan Number 4582218100 transmitted to Budget Towing and Recovery Simmons Bank account ending in 8858 | $119,900.00 |
| 5 | May 13, 2020 | Loan transmitted from BlueVine to Budget Trucking Simmons Bank account ending in 5158 | $40,632.00 |

All in violation of Title 18, United States Code, Section 1343.

**Count 6**
**Mail Fraud**
**18 U.S.C. § 1341**

95.     Paragraphs 1 through 4 and 37 through 38 are incorporated by reference as if fully set forth herein.

96.     On or about July 3, 2020, in St. Louis, in the Eastern District of Missouri and elsewhere, the defendant,

**DEANDRE D. HORNE,**

devised and intended to devise a scheme and artifice to defraud by means of false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

97.     It was a part of the scheme that on or about July 3, 2020, Defendant Horne purchased a 2020 Ford Truck F-150 Series with a sale price of approximately $60,519.00 from

Bommarito Ford, Inc. in Hazelwood, Missouri, which purportedly was a business vehicle for Serenity.

98. It was further part of the scheme that as a result of the application for financing of the vehicle, a "Business Credit Application" was created for Serenity Home Health Care CDS, LLC with the guarantor as "HORNE DEANDRE D."

99. It was further part of the scheme that after the business credit application was approved for financing, Horne was required to purchase title and pay sales tax on the vehicle.

100. It was further part of the scheme that with his application for Missouri Title and License, Horne submitted via U.S. Mail to the Missouri Department of Revenue a "total loss letter" on American Family Insurance letterhead, which stated that a 2017 Porsche Cayenne Turbo AWD in the name of Serenity Home Health Care CDS had been deemed a total loss on June 1, 2020, and that the cash value of the loss was $59,249.82.

101. It was further part of the scheme that the American Family Insurance letter was falsified and that, in reality, neither Horne nor Serenity had owned the identified Porsche Cayenne Turbo AWD, and that American Family Insurance had not deemed such vehicle a total loss.

102. It was further part of the scheme that the false and fraudulent American Family Insurance letter allowed Horne to obtain a credit of $59,248.82 when calculating his sales tax on the 2020 Ford Truck F-150 Series, to which he was not entitled. As a result, Defendant Horne paid only $153.67 in sales tax on the vehicle, rather than $5,407.09.

103.    On or about the date set forth below, in the Eastern District of Missouri and elsewhere, and for the purpose of executing and attempting to execute the scheme and artifice, the defendant,

**DEANDRE D. HORNE,**

did knowingly cause to be sent, delivered, and moved by the United States Postal Service as described below:

All in violation of Title 18, United States Code, Section 1341.

| COUNT | DATE | MAILING |
|:---:|:---:|:---|
| 6 | August 13, 2020 | American Family Insurance letter received via U.S. mail at the Missouri Department of Revenue in Jefferson City, Missouri from License Office in Florissant, Missouri |

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.    Pursuant to Title 18, United States Code, Sections 982(a)(2) and 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Sections 1343 or 1347 as set forth in Counts 1, 3, 4, 5, and 6, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offenses.

2.    Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, upon conviction of an offense in violation of Title 18, United States Code, Section 641 as set forth in Count 2, the defendant shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said offense.

3.    Also subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to Defendant's offenses.

4.    If any of the property described above, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;
b.  has been transferred or sold to, or deposited with, a third party;
c.  has been placed beyond the jurisdiction of the court;
d.  has been substantially diminished in value; or
e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.


_____
FOREPERSON



SAYLER A. FLEMING
United States Attorney


_____
MEREDITH L. REITER, #6325095(IL)
Assistant United States Attorney